

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00141-CV

| | | |
|---|---|---|
| In the Interest of S.I.-M.G. and S.B.G.-R., the Children | § | From the 431st District Court |
| | § | of Denton County (2010-11061-16) |
| | § | November 15, 2012 |
| | § | Opinion by Justice Walker |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Sue Walker



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00141-CV

---

IN THE INTEREST OF S.I.-M.G.
AND S.B.G.-R., THE CHILDREN

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Mother appeals the judgment following a jury trial in which her parental rights to S.I.-M.G. and S.B.G.-R. were terminated. In five issues, Mother argues that the trial court erred by failing to include her proposed jury instruction to disregard the wealth of the parties, that the trial court erred by including jury questions on section 161.001(1)(D) and (E) endangerment grounds because

---

[1]*See* Tex. R. App. P. 47.4.

there was no evidence to support them, that there was no evidence that Mother had failed to complete the services on her service plan, and that the attorney ad litem had failed to present S.I.-M.G.'s legal position to the trial court. We will affirm.

## II. FACTUAL BACKGROUND

The voluminous reporter's record, which includes over 2,000 pages of testimony and six volumes of exhibits, reveals a history of drug abuse that has, unfortunately, plagued Mother and her family for decades. Because the appeal can be disposed of based on Mother's conduct and because the sufficiency of the evidence to support the best interest finding is not challenged, the facts set forth below focus on Mother's conduct.

### A. Mother's Upbringing

Mother and her twin brother started living with their grandmother when they were four months old because their mother had drug and alcohol issues, and their father had drug issues. After Mother's grandmother died when Mother was a teenager, Mother lived with her uncle off and on. Mother attempted suicide around age sixteen. Mother admitted to her uncle that she had used drugs. The uncle testified that Mother's mother's addiction problems had affected her ability to parent Mother and that he was fearful that Mother would experience the same problems because of her own addiction.

3

## B.  Mother's Relationship with Paul and Her Criminal Background

Mother dated Paul for a year before she became pregnant with S.I.-M.G. at age eighteen.  Paul was verbally and emotionally abusive to Mother after he started taking methamphetamine and abusing nitrous oxide.  Paul told Mother that she had to steal money for him.  Mother feared Paul because he had previously hurt her "extremely badly," requiring her to be sent to the hospital.  So Mother wielded a pocket knife that Paul had provided and robbed a woman with her seven-year-old son at an ATM.  Mother also robbed an older woman at NorthPark Mall.  Mother was arrested for two counts of aggravated robbery and placed in jail.[2]

## C.  First Removal of S.I.-M.G.

While Mother was in jail, Steve Buchanan, a detective with the Denton Police Department who investigated drug-endangered children cases, performed a welfare check at S.I.-M.G.'s grandmother's home on January 28, 2008,[3] because someone had called and reported that S.I.-M.G. had missed school for a few days.  The grandmother told him that she did not have transportation to

---

[2]Prior to her arrest on the two aggravated robbery charges, Mother had been convicted of possession of marijuana and DWI.

[3]Detective Buchanan noted that a welfare concern call had also come in on January 24, 2008.

4

take S.I.-M.G. to school and that she was caring for S.I.-M.G. because Mother was in jail.[4]

Detective Buchanan testified that he went back to S.I.-M.G.'s grandmother's house on February 19, 2008, because he had received a CPS case on S.I.-M.G. and the CPS report contained allegations that the grandmother was a prescription drug addict. The grandmother was talking very fast and was jumping from subject to subject without being asked any questions; she was visibly under the influence of drugs. The grandmother told Detective Buchanan that she was taking Lortab and hydrocodone, and he was able to view the bottles. Each of the two bottles had been filled seven days prior and contained 180 pills; out of the total of 360 pills, 50 remained.

The grandmother consented to a search of the house, which turned up a crack pipe, a green baggie with some white residue, and an empty syringe. The crack pipe and the green baggie were located in the master bedroom, which the grandmother said that she shared with S.I.-M.G. The location where the crack pipe was found was not far from a "play" skillet and was within the child's reach. The crack pipe tested positive for cocaine.

CPS made the decision to remove S.I.-M.G. from the grandmother in February 2008 because of the condition of the grandmother and because of the crack pipe and baggie that were found in the house and readily accessible to

---

[4]The grandmother told Detective Buchanan that she had been caring for S.I.-M.G. since December 2007 because Mother was in jail on a robbery charge.

S.I.-M.G. Detective Buchanan testified that a hair follicle test on S.I.-M.G. came back positive for cocaine. Detective Buchanan later obtained two warrants for the grandmother's arrest for possession of a controlled substance under a gram and endangering a child, and the grandmother was ultimately arrested.

### D. Mother Receives Probation and the Department Returns S.I.-M.G. to Mother

On June 12, 2008, Mother was placed on probation for ten years. After Mother was placed on probation, she diligently worked her service plan, and S.I.-M.G. was returned to her.

### E. Police Arrest Mother's Boyfriend Chris in Possession of Heroin

Sergeant Brad Curtis, who was sergeant over special operations including narcotics, testified that on September 10, 2010, he had received information regarding an individual who was possibly trafficking narcotics at the Foxfire Apartments in the Bell Avenue area. Sergeant Curtis found Chris, Mother's boyfriend, "completely out of it"; he almost fell while walking into the parking lot.

Sergeant Curtis found a straw and a baggie with a black tar substance in Chris's front pocket. More drug paraphernalia and black tar heroin were found in Chris's backpack. The total black tar heroin was twenty-three grams, which had an approximate street value of $2,300 and was the largest amount that Sergeant Curtis had obtained at one time. Sergeant Curtis testified that the backpack that Chris was carrying on the day in question was one that could have been easily

opened by a child. A purse found in the backpack contained three prescription bottles labeled as belonging to Mother.

Sergeant Curtis spoke with Mother at her apartment, and she said that she had no knowledge about what was taking place. Sergeant Curtis said that Mother was cooperative and that her reaction regarding Chris was, appropriately, anger.

## F. Second Removal of S.I.-M.G.

Jennifer Matthews, an investigator with the Department of Family and Protective Services, testified that after a referral for drug abuse came in to the Department, she went on September 13, 2010, to the school to speak with S.I.-M.G., who was seven. S.I.-M.G. said that Mother, her Uncle Jacob, and her grandmother lived in her home; her "dad" Chris, who was Mother's paramour, was no longer living with them because he had been arrested. S.I.-M.G. did not know what drugs were; she said that Chris had been arrested for "heritage" but did not know what that was. S.I.-M.G. said that they do not have many friends that come to the house; Mother usually lays on the couch most of the time.

Matthews attempted to talk to Mother, but she was not home. Matthews received a phone call the following day from the grandmother; Mother was at the doctor being treated for complications related to her pregnancy.[5] When Matthews spoke with Mother on September 14, 2010, the first thing Mother said

_____

[5]After Chris was arrested, Mother decided that she could not do drugs anymore and tried to quit, which caused a "near miscarriage."

7

when Matthews arrived at the apartment was that she had left her purse at the hospital and did not have her medicine bottles; Matthews thought this was odd because she had not asked about Mother's purse or medicine bottles.[6]

Mother continued to volunteer information, including that she needed to go see her therapist and that she did not want Matthews to talk to her probation officer or CASA because they would be upset that CPS was involved in her life again. Matthews testified that Mother's drug test from the previous night was positive for amphetamines (in addition to positive for opiates, which she had a prescription for), but Mother claimed that she had never done speed and denied having a drug history. Mother said that she was taking Xanax for anxiety and Lortab (hydrocodone) for a back injury that had occurred seven years earlier. Mother's hydrocodone prescription allowed her to take two tablets every four hours, but the prescription was only for twenty pills. Mother admitted that she had started using more than she should have of the hydrocodone and Xanax.

Although Mother knew before 2010 that Chris was taking hydrocodone for an injury and kidney stones, and although Mother had suspicions that Chris had used drugs, Mother said that there was never any blatant proof of illegal drug use. Because Chris had never used heroin in Mother's presence, Mother did not believe that Chris was a heroin addict. Mother said that Chris's arrest was a misunderstanding and that the backpack belonged to Chris's brother. But Mother

---

[6]Matthews later learned from the hospital that Mother did not leave her purse there; she left her discharge papers.

indicated that she understood that Chris could not be around the family and was not to have contact with S.I.-M.G.

The grandmother took a drug test that was positive for opiates because she was on hydrocodone and Xanax, just like Mother. Fifteen days after the grandmother's 120-count bottle of hydrocodone was filled, it contained only eight pills, even though it should have contained approximately sixty. The grandmother said that she put them in a separate container. Mother and the grandmother declined to sign a medical release that would have allowed Matthews to check into their prescriptions.

The next day, on September 15, 2010, Matthews observed Chris leave the apartment; Mother later said that he had been there for only a few seconds. The following day, on September 16, 2010, the Department requested and received custody of S.I.-M.G. S.I.-M.G. was removed because Chris had been arrested for drug use, Chris had not been kept away from S.I.-M.G. as set forth in the safety plan, and Mother and grandmother were overtaking their hydrocodone medication. Matthews testified that Mother's and grandmother's overtaking of hydrocodone affected their brains and the way they paid attention, which could endanger a child. After a temporary placement, S.I.-M.G. was placed with the foster family who had cared for her after she was removed from grandmother's home in 2008.

9

### G. Department Removes S.B.G.-R. After She Is Born Addicted

On September 19, 2010, Mother went into labor at 34.5 weeks and delivered S.B.G.-R.[7] Mother warned the nurses that S.B.G.-R. would be born addicted, and the Department ultimately received a referral because S.B.G.-R. tested positive for benzodiazepine and opiates. Angela Evans, a nurse in the NICU at Presbyterian Hospital of Denton, testified that she cared for S.B.G.-R. after she was born addicted to opiates and "benzoids." S.B.G.-R.'s withdrawal score was twenty-two, which was a very high score; Evans had never seen a score that high before. S.B.G.-R.'s withdrawal symptoms included a very irritable cry; stiffness in her lower legs; jitteriness; an inability to sleep for three hours between feedings; trouble eating;[8] loose, watery stools; and emesis (vomiting). S.B.G.-R. received methadone orally every six hours to help with the withdrawal symptoms. S.B.G.-R. remained in the NICU for approximately five weeks. Upon her discharge, S.B.G.-R. was placed with Chris's parents and continued on Phenobarbital to help with the remaining withdrawal symptoms, which included irritability.

---

[7]S.B.G.-R. was born premature but did not experience symptoms of premature birth.

[8]There was conflicting testimony on this symptom: Matthews listed "trouble eating" as one of S.B.G.-R.'s withdrawal symptoms, but Evans said that S.B.G.-R. was eating well.

## H.  Mother's Drug Evaluation at First Step

Cheryl Crosley-Culberson, the clinical director with First Step Denton County Outreach, testified that Mother underwent an evaluation on October 7, 2010, and told her that she had started drinking alcohol at age sixteen but had not consumed alcohol since 2009, other than social, occasional usage.  Mother told Crosley-Culberson that her first and last use of methamphetamine occurred at age twenty-four and was experimental.  Mother had experimented once with the following drugs:  ecstasy, marijuana, cocaine, LSD, and heroin.  Mother listed that she was taking ten to twenty-five milligrams of Narcan, an opiate, on a daily basis for back pain and that she was taking Zantac and Celexa.  Crosley-Culberson testified that Narcan is a highly addictive drug.  Mother did not tell Crosley-Culberson that she had recently delivered a child on September 19, 2010.[9]  Based on the information received, Mother's diagnostic impression was cocaine abuse and heroin abuse.  Even though Mother had noted only "experimental" use of these drugs, Crosley-Culberson reached that diagnostic impression after reviewing Mother's legal history and her current CPS situation.

## I.  Mother's Service Plan

Brittany Nichols, a former caseworker with CPS, testified that she went over the service plan with Mother on October 15, 2010.  Mother was allowed a two-hour weekly visit with the children, and the Department had trouble getting

---

[9]There is no evidence that Mother was directly asked about this fact and failed to provide the information.

her to leave at the end of each visit because she wanted to stay longer. Nichols noted that this made it difficult on S.I.-M.G.

Nichols tested Mother five times for drugs, and every time she was positive for opiates and "benzos." Nichols lost contact with Mother in November 2010 and later learned that she had been arrested on a probation violation for testing positive for drugs.

### J. Mother's Counseling

Brandy Pounds, a licensed professional counselor who had started seeing Mother in 2009 while she was on probation with Denton County, testified that Mother told her in April 2010 that she was pregnant. At that time, Mother's situation "was kind of ambiguous"; she was struggling in her relationship,[10] with career choices, and with her family. Mother admitted that she was physically addicted to Lortab and Xanax. Mother did not want to be on the medications, but she was fearful of stopping them due to the physical withdrawals that would occur. Mother was remorseful that S.B.G.-R. was born addicted to drugs. Mother told Pounds that she did not refill the prescriptions after she gave birth.

During random drug tests, Pounds testified that Mother had tested positive for hydrocodone. Pounds said that in a drug test, both hydrocodone and heroin come back as opiates.

---

[10]Mother had told Pounds that Chris's heroin addiction was a problem in their relationship and that was why she struggled with staying with him.

Mother last saw Pounds in November 2010 because the probation department notified Pounds that they would no longer fund the counseling. It surprised Pounds that Mother's probation was revoked in November 2010 after a hair strand of Mother's tested positive for heroin. Pounds testified that "heroin wasn't even an issue we were treating [Mother] for."

### K. Mother's Probation Revoked After Positive Drug Test

Mother's probation was revoked in early November 2010 because Mother tested positive for heroin. Mother was placed in jail in Dallas County. While she was in jail, Mother wrote a letter to Chris telling him which drugs he could take that would not show up on a urinalysis. Mother was later transferred to SAFPF (substance abuse felony prison facility).

### L. Chris's Second Drug Arrest

Shane Norie, an investigator with the Denton County Sheriff's Office's narcotics unit, testified that he was an undercover officer who worked to dismantle drug organizations, including the one that Chris was a part of. Norie arrested Chris on May 19, 2011. Norie testified that Chris had "a substantial impact" on the Denton area because he was selling quite a bit of black tar heroin. Norie testified that Chris had sold three grams a week for approximately a month, then he sold six grams for about two weeks, and then he started selling ounces. Chris told Norie that he was using heroin daily. Norie testified that in this scenario, he would find it hard to believe that Mother did not know that Chris was using heroin. Norie said that if Mother was also on drugs, it might cause her not

to recognize that Chris was on drugs. Norie testified that the use of heroin impacts the ability to parent and is endangering to a child and that a drug environment filled with addicts is dangerous to a child even if no dope is present.[11]

### M. Mother's Time in SAFPF the Halfway House

Mike Storm, a Dallas County adult probation officer, testified that SAFPF is a treatment center inside the Texas Department of Corrections where people who have chemical addictions are sent for ninety days to a year. When they are released, they check into TTC, which is a transitional treatment center for ninety days. After that, they go into aftercare treatment for six to nine months, during which time they attend after care twice a week, attend two NA/AA meetings per week, visit their probation officer twice a month, and attend individual counseling twice a month.

Storm testified that Mother had entered the Henley Unit on April 1, 2011; was released on December 28, 2011; and entered the TTC program at the Salvation Army that same day. While Mother was at the Salvation Army she was required to maintain her recovery by attending AA/NA meetings, undergoing counseling, seeking employment, starting a savings account, obtaining a twelve-step sponsor for her AA/NA meetings, securing housing, and figuring out

---

[11]There was no evidence that a child was exposed to the heroin found on May 19, 2011; all of the children's things in the apartment were packed up because the children had been removed by the Department.

transportation. Mother was compliant on the program; she had submitted urinalyses that were negative.[12] While Mother was at the halfway house, she requested to resume visits with her daughters, but visits were not authorized.

Glenda Hood, who was Mother's sponsor in her recovery program, testified that she met with Mother three or four times a week at the Salvation Army. Mother told Hood that she "was hooked on prescription pills while she was pregnant" and heroin. Hood testified that Mother is "doing the program" and "receiving treatment well, and she has some issues that she needs to deal with." According to Hood, Mother is making progress on her decision-making skills, but the real test will occur when she is released.[13]

Mother was set to complete the TTC program on March 28, 2012, which was two weeks after the termination trial. But if Mother was not able to finish the program's requirements, her stay could be extended a few days in order to meet the CJAD[14] requirements. After Mother completes the six to nine months in TTC, she will return to regular case load and report to her probation officer once a month until 2018.

---

[12]Dea Davis, a CPS caseworker, testified that a month's worth of clean drug tests in December 2011 to January 2012 did not show a pattern of being able to remain drug-free.

[13]Crosley-Culberson testified that there is a high probability of relapse within the first year.

[14]Although Storm defined "CJAD" as the "criminal justice department out of Austin," it is more commonly known as the Community Justice Assistance Division.

### N. Mother's Testimony

Mother testified that she did not know that she was pregnant for the first four months of her pregnancy with S.B.G.-R. During the early stages of the pregnancy, Mother did not talk to her doctor about being dependent on prescriptions because she did not know that she was pregnant until she was four months' pregnant; Mother admitted that her delay caused a lot of problems for her. Mother also admitted that she had abused drugs for a long time and that when she learned that she was pregnant with S.B.G.-R., she was scared because she knew that she was physically addicted to Lortab and Xanax. Mother testified that she had abused prescription drugs during the first trimester, which is critical to a baby's development. Mother expressed having a "tremendous amount of guilt and shame" for putting S.B.G.-R. through withdrawal because Mother described her own experience of going through withdrawals as "horrible" and stated that she would rather die than go through it again.

### O. Disposition

After hearing the evidence above, the jury answered "yes" to every dispositive question. The trial court thereafter signed a judgment terminating Mother's parental rights to S.I.-M.G. and S.B.G.-R. based on Texas Family Code section 161.001(1)(D), (E), and (O) and section 161.001(2). This appeal followed.

16

### III. BURDEN OF PROOF IN TERMINATION CASES

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be

established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

## IV. ALLEGED JURY CHARGE ERRORS

### A. Evidence Supports Submission of Jury Question on Endangering Conduct—Section 161.001(1)(E) Grounds

In her fourth issue, Mother argues that the trial court erred by including jury question six, which asked the jury, "Do you find by clear and convincing evidence that the mother, . . . , has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, which endangered the physical or emotional well-being of the child [S.B.G.-R.]?" Mother's argument under her fourth issue is two-fold: she argues (1) that there is no evidence to support the inclusion of jury

question six because if a child is born addicted to a controlled substance legally obtained by prescription, that is not a ground for termination under section 161.001(1)(R) and (2) that there is no evidence to support the inclusion of jury question six because S.B.G.-R. was removed at birth and was therefore under the complete care and control of the Department, not Mother.

The standard of review in determining whether sufficient evidence supports submission of a jury question is different from the standard of review that we apply in reviewing the sufficiency of the evidence to support a jury's finding in a termination trial. The former requires only more than a scintilla of evidence, while the latter must be supported by clear and convincing evidence.[15] Because Mother challenges the evidence to support submission of jury question 6, not the sufficiency of the evidence to support the jury's answer to jury question 6, we apply the jury charge standard of review.

An objection to the submission of a question in the court's charge on evidentiary grounds is a challenge to the legal sufficiency of the evidence. *Elbaor*, 845 S.W.2d at 243. We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only

---

[15]*Compare Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) (stating that objection to question in jury charge is challenge to legal sufficiency), *and Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996) (stating that anything more than a scintilla of evidence is legally sufficient to support a jury finding), *with* Tex. Fam. Code Ann. §§ 161.001, .206(a) (requiring termination decisions to be supported by clear and convincing evidence).

19

evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co.*, 937 S.W.2d at 450; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

Endanger means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). It is not necessary to establish that a parent *intended* to endanger a child in order to support termination of the parent-child relationship under subsection (E). *See M.C.*, 917 S.W.2d at 270. To prove endangerment under subsection

161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125. Courts may look to parental conduct both before and after the child's birth. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by the Department." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Moreover, termination under subsection 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E); *J.T.G.*, 121 S.W.3d at 125.

The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *R.W.*, 129 S.W.3d at 739. The Supreme Court of Texas has acknowledged that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *J.O.A.*, 283 S.W.3d at 345. The Houston First Court of Appeals has explained that illegal drug use may support termination under section 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or

21

imprisoned." *Walker*, 312 S.W.3d at 617. Additionally, illegal drug use during pregnancy can support a charge that the mother has engaged in conduct that endangers the physical and emotional welfare of the child. *In re M.L.B.*, 269 S.W.3d 757, 760 (Tex. App.—Beaumont 2008, no pet.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)). Further, a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

Turning to an analysis of the evidence to support the submission of jury question six, we note that the Department abandoned subsection 161.001(1)(R) as a ground for terminating Mother's parental rights to S.B.G.-R. and proceeded under subsection (E), among other grounds. Under subsection (E), as set forth above, evidence of Mother's drug use, both overuse of prescription medications and use of illegal drugs, may be considered in determining whether some evidence exists to support submission of question six—section 161.001(1)(E) grounds—to the jury. *Compare* Tex. Fam. Code Ann. § 161.001(1)(R), *with id.* § 161.001(1)(E); *compare also In re P.K.C.*, No. 02-08-00060-CV, 2009 WL 279337, at *3 (Tex. App.—Fort Worth Feb. 5, 2009, no pet.) (mem. op.) (considering test results showing that child was born with cocaine in her bodily fluids in analyzing trial court's subsection (R) finding), *with J.O.A.*, 283 S.W.3d at

22

345 (holding that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct" under subsection (E) ground), *In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126, at *7–8 (Tex. App.—Feb. 9, 2006, no pet.) (mem. op.) (considering mother's continuous abuse of prescription drugs in analyzing trial court's subsection (E) finding), *and In re M.Y.*, No. 02-07-00186-CV, 2008 WL 204618, at *10 (Tex. App.—Fort Worth Jan. 24, 2008, no pet.) (mem. op.) (considering mother's continuous abuse of both prescription and illegal drugs in analyzing trial court's subsection (E) finding).[16]

Because case law provides that, in evaluating a parent's conduct under subsection (E), the conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by the Department," we need not, as Mother suggests, focus solely on Mother's conduct after S.B.G.-R. was removed by the Department. *See Walker*, 312 S.W.3d at 617. Looking to Mother's conduct while she was pregnant with S.B.G.-R., Mother testified that she had abused Xanax and hydrocodone during the first trimester, which was during a critical stage of S.B.G.-R.'s development. Although as Mother points

---

[16]From these cases it is clear that prescription drug abuse has been treated as endangering conduct equal with illegal drug abuse and will support a finding of endangering conduct under subsection (E). *See T.D.L.*, 2006 WL 302126, at *7–8 (holding evidence legally sufficient to support trial court's subsection (E) finding because evidence revealed that mother's prior course of conduct regarding her continuous misuse of prescription drugs demonstrated that she had endangered her children's well-being; although mother had tested positive for marijuana and cocaine on two occasions, the emphasis throughout the analysis was on mother's continuous abuse of prescription drugs). We therefore continue to follow the prior precedent of this court.

out, Mother's doctor continued to prescribe Xanax and hydrocodone for her during her pregnancy with S.B.G.-R., Mother did not know or reveal to her doctor that she was pregnant until she was four months' pregnant. The record also reveals that throughout her pregnancy, Mother not only continued to take the prescriptions in the prescribed dosage but also that Mother abused the prescriptions, exceeding the dosage prescribed by the doctor, which endangered S.B.G.-R. and contributed to S.B.G.-R.'s addiction to opiates and benzodiazepines. As set forth above, S.B.G.-R. remained in the hospital for five weeks after birth while she was on methadone for withdrawals, and when she was released, she continued on Phenobarbital for the remaining withdrawal symptoms. This evidence constitutes more than a scintilla of evidence to support the inclusion of jury question six regarding Mother's endangering conduct toward S.B.G.-R. *Accord M.E.-M.N.*, 342 S.W.3d at 262–64 (holding evidence legally sufficient to support factfinder's firm conviction or belief that appellant had engaged in conduct that endangered child because appellant had abused prescription drugs, along with testing positive for cocaine or methamphetamine); *In re V.R.*, No. 02-09-00001-CV, 2009 WL 2356906, at *6 (Tex. App.—Fort Worth July 30, 2009, no pet.) (mem. op.) (holding evidence sufficient to support trial court's endangerment findings based on mother's drug history and her drug use before and during the termination proceedings, regardless of the medical reasons for which she claimed she took the drugs; mother had taken Vicodin while pregnant and tested positive for the drug at child's birth and at times after

24

birth, which showed a continuing course of conduct); *T.D.L.*, 2006 WL 302126, at *7–8 (holding evidence legally sufficient to support trial court's subsection (E) finding because evidence revealed that mother had continuously abused prescription drugs).

Even without the evidence of Mother's prescription drug use in excess of the prescribed dosage, the evidence is sufficient to support the inclusion of jury question six because there was evidence that Mother had used heroin before and after S.B.G.-R. was born. Glenda Hood, Mother's sponsor at the Salvation Army, testified that Mother had told her that she had used heroin while pregnant with S.B.G.-R. Additionally, Mother's evaluation at First Step Denton County Outreach in October 2010 showed that Mother had abused cocaine and heroin. And in early November 2010, approximately six weeks after S.B.G.-R. was born, Mother's probation was revoked after a hair strand test came back positive for heroin; Mother thereafter spent time in SAFP and in a halfway house and was still living at the halfway house during the termination trial. The above is some evidence that Mother's continuous, voluntary, deliberate, and conscious course of conduct—that is, using illegal drugs during her pregnancy and after her children had been removed, as well as spending time in jail—subjected S.B.G.-R. to a life of uncertainty and instability and supported the inclusion of jury question six that Mother had engaged in conduct that had endangered S.B.G.-R.'s physical or emotional well-being. We therefore hold that more than a scintilla of evidence exists to support the submission of the section 161.001(1)(E)

25

endangering conduct question to the jury. *See, e.g., Patlyek v. Brittain*, 149 S.W.3d 781, 789 (Tex. App.—Austin 2004, pet. denied) (holding that there was some evidence to support the submission of the past physical impairment element of damages); *see also In re D.J.W.*, No. 01-11-00703-CV, 2012 WL 3525542, at *9 (Tex. App.—Houston [1st Dist.] Aug. 16, 2012, no pet. h.) (holding evidence legally sufficient to support finding that mother used illegal narcotics before and after child was taken into custody by Department and that mother's drug use endangered the physical or emotional well-being of child by exposing him to risks that mother would be impaired or imprisoned); *M.L.B.*, 269 S.W.3d at 760 (holding evidence sufficient to establish grounds for termination because mother had a long history of drug abuse and knew she was pregnant when she consumed controlled substances).[17] We overrule Mother's fourth issue.[18]

---

[17]Mother does not challenge the sufficiency of the evidence supporting the subsection (E) finding. Even if such a challenge had been made, based on the evidence and case law set out above, it would not result in a reversal as the record demonstrates that the jury's subsection (E) finding is supported by clear and convincing evidence of Mother's conduct—including abuse of prescription drugs and illegal drug use, limited prenatal care, and imprisonment—that endangered the physical or emotional well-being of S.B.G.-R.

[18]Along with a best interest finding, which we discuss below, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *See In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.— Fort Worth 2007, no pet.). Because we hold that the evidence supports the termination of Mother's parental rights under section 161.001(1)(E), we need not address Mother's second issue challenging the section 161.001(1)(O) finding or Mother's third issue challenging the submission of the section 161.001(1)(D) jury question. *See* Tex. R. App. P. 47.1 (stating that appellate court need address every issue necessary for final disposition of appeal).

## B. No Charge Instruction Required on Wealth; Ability to Provide Necessities Is Proper Consideration in Best Interest Analysis

In her first issue, Mother argues that the trial court abused its discretion by failing to instruct the jury that they should disregard the relative wealth of Mother compared to the proposed adoption candidates for the children. Specifically, Mother argues that the trial court abused its discretion by not including in the jury charge her proposed instruction—i.e., "You are instructed that you are not to consider the wealth of any person in answering any question submitted to you by the court." The trial court denied the requested instruction stating, "I agree with you that wealth alone should not be a factor in this case, but I believe that that oversimplifies the issues in the case as well."

We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review. *See In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) (citing *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)). The trial court has considerable discretion to determine necessary and proper jury instructions. *See id.*

A parent's rights cannot be terminated based on poverty without a showing that the poverty has endangered the child. *See Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied). Nor can a parent's rights be terminated based on a foster family's ability to provide more than a biological parent can provide. *See generally In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.) (stating that under

27

best interest prong of section 161.001(2), termination should not be used to merely reallocate children to better and more prosperous parents).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and
>
> (F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

29

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).  A parent's lack of education, training, or misfortune, including poverty, falls within the final category of factors enumerated in *Holley*, and is thus only one of the factors to be considered by the trier of fact in determining the best interest of the child.  *In re S.H.A.*, 728 S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

Here, the focus of the trial was not on Mother's wealth or lack thereof but rather on whether she, as a recovering drug addict living at a halfway house, could provide for her children.  During the questioning of Chris's mother, who was caring for S.B.G.-R., it was clear that the issue was not about who had more wealth but about whether Chris and Mother, who were in jail and at a halfway house, respectively, could provide basic necessities for the children:

>        Q.   Now, you were asked some questions about money, having money for raising children.  Do you recall Mr. Trantham's questions about that?
>
>        A.  No, not really.
>
>        Q.  That you have the money and the resources to provide, to take trips.  Do you recall that line of questions?

A. Yes, uh-huh.

Q. Wouldn't you say as a parent that when you refer to money, that you're not talking about affluence. You're talking about money being necessary to live on, to provide, eat, put a roof over your head?

A. Exactly.

Q. Do you think those are necessities, basic necessities that a parent is responsible for providing for their children?

A. Yes.

Q. And in testifying here to the jury today, wouldn't you agree with me that as your son and [Mother] sit in this courtroom, to the best of your knowledge, they don't have jobs, they don't have money, and they don't have a roof over their head?

A. That's what I understand.

Q. And do you think that as we sit here today, if the Court ordered the children back into their custody, that you don't know where they would live?

A. No, I do not.

Q. Or how they would feed those children?

A. No.

Because under the section 263.307(b) factors and the *Holley* factors listed above the jury was allowed to consider in making its best interest determination whether Mother could provide her children with health and nutritional care and a safe physical home environment and whether she could provide for her children's emotional and physical needs, which could be weighed against any excuse (such as poverty) for her inability to provide, we hold that the trial court did not abuse its

31

discretion by denying Mother's proposed jury instruction to disregard the relative wealth of the parties. *See* Tex. Fam. Code Ann. § 263.307(b); *Holley*, 544 S.W.2d at 371–72; *S.H.A.*, 728 S.W.2d at 90–91 (despite parents' poverty and low intelligence, legally sufficient evidence supported best interest finding because parents did not have the capacity or the ability to care for child); *see also In re T.N.*, 180 S.W.3d 376, 385 (Tex. App.—Amarillo 2005, no pet.) (citing *S.H.A.* and holding that evidence was sufficient to support best interest finding because evidence showed that mother's drug use and demonstrated association with other drug users constituted a danger emotionally and physically both in the present and future). We overrule Mother's first issue.

## V. MOTHER LACKS STANDING TO CHALLENGE AD LITEM'S REPRESENTATION OF CHILD

In her fifth issue, Mother argues that S.I.-M.G.'s ad litem "failed and refused to present her client's legal position to the court."[19] Mother contends that S.I.-M.G. was denied due process of law because despite S.I.-M.G.'s requests to have contact with Mother, the attorney ad litem "insisted that the best interest of the child required termination." Mother further argues that the attorney ad litem did not "have standing to advocate for termination on behalf of the child."

---

[19]The attorney ad litem represented both S.I.-M.G. and S.B.G.-R. On appeal, Mother challenges only the attorney ad litem's representation of S.I.-M.G. This is the only challenge that Mother makes to the termination of her parental rights to S.I.-M.G.

Without citing any statutory or case law, Mother summarily states that she has standing to bring this issue because she is "the mother of the child, best friend, and only person able to make legal decisions for the child until those powers were usurped by the State." We disagree.

A party may not complain of errors that do not injuriously affect her or that affect only the rights of others. *In re T.N.*, 142 S.W.3d 522, 524 (Tex. App.—Fort Worth 2004, no pet.) (citing *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 988 S.W.2d 750, 752 (Tex. 1999); *Buckholts ISD v. Glaser*, 632 S.W.2d 146, 150 (Tex. 1982); *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 92 (Tex. 1973)). An exception exists when the appellant is deemed to be a party under the doctrine of virtual representation, which requires among other elements that the appellant and the children have identical interests. *Id.* (citing *Gunn v. Cavanaugh*, 391 S.W.2d 723, 725 (Tex. 1965)). The record does not show that Mother and S.I.-M.G. have identical interests, nor does Mother claim that they do. Instead, without presenting any evidence that Mother suffered harm from the ad litem's representation of S.I.-M.G., Mother seeks to exploit the alleged deficiencies of the child's counsel for her own use on appeal.

Mother does not have standing on appeal to complain about the performance of the child's attorney on the child's behalf. At the time of the trial, CPS had temporary managing conservatorship, including the right to represent the child in a legal action and to make other decisions of substantial legal significance concerning the child. *See* Tex. Fam. Code Ann. § 153.371(8) (West

33

2008). Mother did not have that right then, nor does she now on appeal. Further, Mother has no standing to complain about the child's lawyer on her own behalf. *See T.N.*, 142 S.W.3d at 524 (citing *Mandlbauer*, 988 S.W.2d at 752; *Glaser*, 632 S.W.2d at 150; *Jackson*, 499 S.W.2d at 92; *see also In re Frank L.*, 97 Cal. Rptr. 2d 88, 90, 81 Cal. App. 4th 700, 703 (Cal. Ct. App. 2000) (holding that parents must actually make a showing that ineffective assistance of the children's attorney affected the parents' interest to have standing to raise the claim)).[20] Because Mother lacks standing to complain about the child's attorney ad litem, we overrule Mother's fifth issue.

## VI. CONCLUSION

Having overruled every issue necessary for disposition of this appeal, we affirm the trial court's judgment terminating Mother's parental rights to S.I.-M.G. and S.B.G.-R.

> SUE WALKER
> JUSTICE

PANEL: WALKER, MCCOY, and GABRIEL, JJ.

DELIVERED: November 15, 2012

---

[20]Moreover, assuming in the alternative that Mother did have standing to complain about S.I.-M.G.'s ad litem, Texas Family Code section 107.008 states that an attorney ad litem may determine that the child cannot meaningfully formulate the child's objectives of representation and, in that case, may present to the court a position that the attorney determines will serve the best interest of the child. Tex. Fam. Code Ann. § 107.008(a)–(b) (West 2008).